UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                       Case No. 22-CR-147-LA-SCD

GREGORY HAYES,

     Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS FRUITS OF INVALID SEARCH WARRANT

The United States charged Gregory Hayes with drug trafficking, unlawful possession of firearms, check fraud and possession and sale of a stolen vehicle. The charges followed a twenty-nine-month investigation into what law enforcement dubbed the "Gregory Hayes Drug Trafficking Organization." Over the course of this investigation, law enforcement surveilled and monitored numerous individuals that it believed to be participants in the organization. Finally, in July 2022, the United States applied for several search warrants with the support of a seventy-page affidavit, and I issued the warrants.[1]

Hayes has moved to suppress the fruits of the searches of three properties, arguing that the affidavit does not establish probable cause that Hayes was involved in any criminal activity. Neither, he argues, does it establish a nexus between the premises searched and

---

[1] It is common practice in this district for magistrate judges to issue reports and recommendations on warrants they issued themselves. There are many reasons for this. First, at the issuing stage, the warrant is considered *ex parte*, i.e., without the benefit of contrary argument. Upon a challenge to the warrant, however, the magistrate judge becomes the beneficiary of arguments not previously considered. This allows the judge to take a fresh look at the warrant. Second, it is common for judges to be asked to reconsider their own rulings and orders. As such, there is nothing out of the ordinary about being asked to consider one's own issuance of a warrant. Finally, the issuance of a report and recommendation is merely that—a recommendation.

purported criminal activity. Specifically, Hayes contests whether there was probable cause to search the addresses at 8018 West Hope Avenue (Hayes's residence), 7704 West Appleton Avenue (Hayes's business, Auto Source LLC), and 134 East Chateau Place (Hayes's girlfriend's residence). The government opposes the motion. I conclude that probable cause existed to search the premises and that Hayes has failed to rebut the presumption that the executing officers relied on the warrant in good faith. Accordingly, I will recommend that Hayes's suppression motion be denied.

## BACKGROUND

Because Hayes argues that the affidavit which led to the search of three properties was not supported by probable cause, I will focus on the facts as communicated in the affidavit. *See* ECF No. 29-1 ¶¶ 1-118. The affiant, DEA Task Force Officer Nick Stachula, first attests that based on his twenty-two years of law enforcement experience and his experience with the investigation, he believed that there was probable cause to search the three properties. *Id*. ¶¶ 1-9. Officer Stachula believed that Hayes was involved in two separate criminal enterprises: drug trafficking and a fraudulent vehicle sales operation involving fraudulent cashiers' checks and odometer rollbacks. The fraudulent vehicle sales enterprise allegedly operated as follows: first, Edward Youngblood (Hayes's co-defendant) and others would purchase high-mileage vehicles with fraudulent cashiers' checks. Then, Hayes would use specialized equipment to modify the odometers of the vehicles to show a lower mileage. Next, Hayes would "wash" the cars' titles to create a paper trail to validate the false mileage. Finally, Hayes would sell the cars at a price reflecting the falsely lowered mileage. *Id*. ¶¶ 73-83.

Officer Stachula stated that the investigation began in February 2020 following a tip from a confidential source, CS-1. *Id*. ¶ 10. CS-1, who provided information and conducted

controlled buys for law enforcement, named a suspect, Michael Brown, as a dealer who received drugs from Hayes, "who is known as a large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area." *Id*. Officer Stachula did not detail the evidence supporting Hayes's leadership of this distribution network at this point in the affidavit.

Officer Stachula next provided a brief summary of the remainder of the affidavit before diving into the specific details. *Id*. ¶ 11. He explained that agents conducted controlled buys for drugs with suspected members of the Gregory Hayes Drug Trafficking Organization (the DTO), executed multiple search warrants, conducted hundreds of hours of surveillance, executed multiple "trap and trace" cell phone warrants, and obtained reliable information through other sources, all of which led the team to believe that Hayes and Auto Source LLC were instrumental parts of the DTO. *Id*. This investigation "also yielded information that Gregory Hayes was involved in odometer and bank fraud, resulting in the theft of commercial motor vehicles or luxury vehicles over the amount of $750,000.00." *Id*.

## I.    Connections to Drugs and Drug Dealers

The affidavit connects several apparent drug dealers to Auto Source LLC. First, both Hayes and Auto Source LLC are connected to a known drug dealer named Calvin Coleman. Coleman previously ran the auto shop Total Experience Car Care, which Hayes took over and renamed Auto Source in August 2019. *Id*. ¶ 12. Coleman is a felon with a past conviction for conspiracy to distribute cocaine as a "kilogram level cocaine dealer." *Id*. In addition to being connected through the auto shop, Coleman and Hayes had close personal connections; during the investigation, Coleman was "a consistent top phone contact" of Hayes. *Id*. ¶¶ 13, 21.

Surveillance also connected Hayes and Auto Source to several other known drug dealers. For example, law enforcement observed the vehicle of Jermaine Renix, a suspected drug dealer, stopping at Auto Source in August 2021 prior to a legal search of his residence, which uncovered several firearms, over 700 grams of cocaine, narcotics distribution paraphernalia, and almost $3,000 in cash. *Id.* ¶ 22. Later, in January 2022, law enforcement apprehended a drug dealer named Henry Bryant, and in searching his vehicle incident to his arrest, found 18.5 grams of fentanyl, two meth pills, 8.5 grams of THC, and $2,987. More importantly to this investigation, they also found two new license plates listed to Auto Source. *Id.* ¶ 24.

On another occasion, case agents observed a young man suspected to be Dionte Paige, a known drug dealer, driving an Acura sedan registered to Yolanda Paige into the Auto Source parking lot.[2] *Id.* ¶ 15. The man met with Hayes and brought a large box from Hayes's car into the Auto Source building. *Id.* On another occasion, after a source conducted a controlled drug buy with James Sims, Sims met with Paige, and then drove to Auto Source. *Id.* Sims and Paige were both later arrested and charged with conspiracy to deliver cocaine and heroin. *Id.*

In addition, Jason Dorzok, a former mechanic employed by Hayes and Coleman at the auto shop, told law enforcement that Hayes had provided him with drugs. *Id.* ¶¶ 31-32. Dorzok told agents that he had received drugs in exchange for buying vehicles for Hayes with

---

[2] Officer Stachula concluded that the man observed working with Hayes in the Auto Source parking lot was likely Dionte Paige because the man matched Paige's description and drove a vehicle registered to Yolanda Paige, who was also the registered owner of the vehicle involved in criminal charges against Dionte Paige for Conspiracy to Deliver Heroin and Cocaine (Milwaukee County Case # 2022CF1546). *Id.* ¶ 15. In the Milwaukee County case, Dionte Paige was observed driving a BMW registered to Yolanda Paige to deliver heroin and cocaine. This investigation yielded evidence suggesting significant drug trafficking activity, including three semi-automatic handguns, a "ghost gun" automatic rifle, over 689 grams of cocaine, over 512 grams of heroin, over 211 grams of fentanyl, and over $60,000 in US currency.

fraudulent checks four or five times. *Id.* ¶ 31. When Hayes did not have the cocaine at Auto Source for Dorzok, Dorzok claimed that Hayes stepped out for no more than a few minutes to retrieve the cocaine, which led Dorzok and case agents to believe that Hayes kept the cocaine at his home, which was very close to the shop. *Id.* Dorzok also claimed that he had seen scales and baggies at the Auto Source shop that he believed related to dealing narcotics. *Id.* ¶ 34.

Finally, Officer Stachula described a recorded jail call between Hayes and an inmate, Donte Davis. *Id.* ¶ 18. During this call, Hayes apparently paused in his conversation with the inmate to speak with another person in the background to ask about "Grey," a known street name for heroin, and the person responded that he "gave it to Q." *Id.* Hayes asked the person "[y]ou count it? That was it?" *Id.* Hayes then said "[g]ave you what $5,000? . . . call him and get my other G," which law enforcement believed to be a demand for another $1,000 related to drug trade. *Id.*

## II.    Connections to Odometer and Check Fraud

Officer Stachula also provided information relating to the fraudulent vehicle sale organization. As stated earlier, law enforcement believed that Hayes and others were involved in a criminal organization which purchased vehicles with false checks, rolled back the mileage on these vehicles' odometers, modified the vehicle records, and sold the cars at inflated prices. In support of this suspicion, Officer Stachula's affidavit provided evidence from a former participant in this scheme, records from vehicle purchases and sales, tax forms, and personal connections between Hayes and individuals charged with various types of related fraud.

Case agents heard Hayes make statements on two separate recorded jail phone calls which they believed connected Hayes to fraudulent car sales. First, on May 27th, 2020, Hayes

spoke with Montravious Gray. *Id.* ¶ 17. Gray mentions that he had spoken with a third person to "put up some cars on craigslist." *Id.* Gray also stated that another person, Terry, had "just left Iowa to get some trucks," and that she knew about "the game regarding the box truck, but she was timid at first." *Id.* On a different call to inmate Terrell Douglas, Hayes told Douglas that he was picking up cars from an auction. *Id.* ¶ 19. In the background of the call, Hayes tells someone that he is there to pick up car titles for "Merrywood," a business owned by Robert M. Woods that has been the target of several Department of Transportation (DOT) investigations for odometer fraud. *Id.* ¶¶ 19, 89. The DOT had several open cases related to Merrywood at the time of the investigation. *Id.* ¶¶ 27-28. Officer Stachula stated that Merrywood and Auto Source had "purchased at least 150 vehicles with high mileage, then later sold [the vehicles] with lower mileage, indicating evidence of odometer tampering." *Id.* ¶ 88. Officer Stachula then described three of these cars sold by Merrywood and cited vehicle records like titles and odometer disclosures to demonstrate that Merrywood doctored the mileage on each car's odometer. *Id.* ¶ 89.

In addition to examples of Merrywood's involvement in odometer fraud, Officer Stachula provided several examples of Hayes's close connections to Merrywood. In working with the IRS, case agents found sixteen form 8300s[3] documenting sixteen transactions valued over $10,000 each between Merrywood Investments and Hayes. *Id.* ¶ 23. There is also the afore-mentioned call between Hayes and Douglas in which Hayes could be heard picking up car titles on behalf of Merrywood. *Id.* ¶ 19. Case agents had also observed Woods's vehicle at Hayes's house. *Id.* ¶ 21.

---

[3] Form 8300s are tax forms necessarily completed in connection with a transaction involving more than $10,000 in U.S. currency. *Id.* ¶ 23.

Officer Stachula also explained that Hayes and Auto Source were connected to the alleged purchase of vehicles with fraudulent checks. In April 2022, case agents began contacting agencies in Wisconsin and Illinois regarding the fraud investigations around Hayes, Youngblood, and others. *Id.* ¶ 51. These agencies reported fraudulent checks related to the investigation from all over Wisconsin, and Youngblood and three others were "identified as the persons passing the fraudulent cashier's checks," under various aliases. *Id.* ¶¶ 51, 53. Jason Dorzok claimed that he participated in the check fraud with Youngblood on behalf of Hayes. *Id.* ¶ 29. Per Dorzok's statements, Youngblood (the other defendant in this case) had access to fake cashiers' checks with which he, Dorzok and other associates would buy vehicles. *Id.* ¶ 30. Dorzok claimed that they would then bring the vehicles to Auto Source, where Hayes could "obtain legitimate paperwork" for the vehicles. *Id.* ¶ 29. Phone records confirm that Hayes and Youngblood were in close contact during this period of time; in the approximately two-month period from mid-April 2022 to mid-June 2022 (during which case agents began investigating the alleged check fraud and law enforcement began recovering the fraudulently purchased vehicles) Youngblood and Hayes contacted each other over the phone some 465 times. *Id.* ¶¶ 54, 59.

Several of the vehicles that case agents identified as fraudulently purchased were found parked just outside Auto Source. Law enforcement recovered a 2015 Freightliner from Racine County and a 2007 Mack truck from the parking lot adjacent to Auto Source, as well as a 2013 Freightliner from Oak Creek that was parked on the street outside Auto Source. *Id.* ¶ 54. In May 2022, DOT Investigator John Kleinfeldt noticed a white Mercedes Sprinter van with a Wisconsin license plate numbered ANF-3612 parked in front of Auto Source that matched the description of a vehicle fraudulently purchased in Waukesha and reregistered

with that same plate number. *Id.* ¶ 56. Case agents also learned that a fraudulently purchased 1967 Chevrolet Camaro had been purchased by associates of Hayes in February 2022. *Id.* ¶ 71. The Camaro had an anti-theft GPS device which marked its last known location just outside of Auto Source. *Id.*

Case agents also found connections between the check fraud and Hayes himself, not just as the owner of the shop, but as an individual. For example, one of the fraudulently purchased vehicles, a 2010 Hino 338 26" straight truck, was found parked just around the corner from Hayes's house and was registered at his home address in the name "Hayes Towing & Transport." *Id.* ¶¶ 54-55.

### III.    Hayes's Arrest and the Second Warrant and Affidavit

I found that the first affidavit indicated there was probable cause to believe that evidence of criminal activity would be found at Hayes's residence and Auto Source. ECF No. 29-1 at 2-5. As such, I signed a warrant to search several properties, including those two on July 7, 2022. *Id.* The second affidavit, also written by Officer Stachula, stated that law enforcement executed these warrants and searched Hayes's residence and business on July 12, 2022. ECF No. 29-2 ¶ 91. The search yielded documents connected to the fraud investigation, five handguns, an assault rifle, several pounds of marijuana, a small amount of cocaine, and other evidence of narcotics distribution. *Id.* Law enforcement took Hayes into custody outside the house of his girlfriend, Nichole Turner, where they had often seen him over the course of the investigation. *Id.* ¶¶ 92-93. Investigators then attempted to speak to Turner, who instructed them to wait in the doorway while she removed her children and a diaper bag from the residence. *Id.* ¶ 93. Investigators then advised her that she could not remove belongings from the residence while the investigation was still pending, but Turner

continued to walk away with the diaper bag. *Id*. The officers then tried to stop her, and Turner became combative. *Id*. During this altercation, the officers observed a large amount of money in the diaper bag, but they did not search it at the time. *Id*. Officers arrested Turner and conducted a protective sweep of the residence, during which they spotted a gun case and a bundle of money. *Id*. ¶ 94. As a result of this incident, law enforcement submitted the second updated affidavit and an application for a warrant to search Turner's residence, which I granted. *See generally* ECF No. 29-2.

On July 19, 2022, a grand jury sitting in the Eastern District of Wisconsin returned an indictment against Hayes. *See* ECF No. 8. On October 19, 2022, a grand jury returned a superseding indictment against Hayes and Youngblood, charging Hayes with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possessing marijuana with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); using a fictitious cashier's check with the intent to fraudulently purchase a vehicle in violation of 18 U.S.C. §§ 1029(a)(1), 1029(c)(1)(a)(i) and (2)(a); and receiving, possessing, storing, selling, and disposing of a stolen motor vehicle in violation of 18 U.S.C. §§ 2313 and 2(a). *See* ECF No. 15 at 1-9.

Hayes was arraigned on the charges and entered a plea of not guilty. *See* ECF No. 20. The matter is assigned to U.S. District Judge Lynn Adelman for trial and to me for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. The case has not yet been scheduled for trial.

On December 5, 2022, Hayes filed a motion seeking an order suppressing the government's use of fruits of the search warrants for his residence, his business, and his girlfriend's residence. *See* ECF No. 29. The government responded to the motion on

December 23, 2022. *See* ECF No. 34. On January 3, 2023, Hayes submitted his reply. *See* ECF No. 35.

## DISCUSSION

Hayes argues that all the fruits of the three searches should be suppressed because the affidavits submitted in support of the search warrant were not supported by probable cause. The government argues that the search-warrant affidavits were not deficient and that, even if they were, the executing officers relied on the warrants in good faith.

## I. Probable cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "When an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003).

"A search warrant affidavit establishes probable cause when it 'sets forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime.'" *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000) (quoting *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990)). In deciding whether an affidavit establishes probable cause, "courts must use the flexible totality-of-the-circumstances standard set forth in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)." *McNeese*, 901 F.2d at 592. Applying the totality-of-the-circumstances standard,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him including the 'veracity' and 'basis of knowledge' of persons supplying

hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238.

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232. Thus, "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175 (1949). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980).

The court's duty in reviewing a search warrant and its supporting materials is limited to ensuring that the issuing judge "had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In other words,

> a magistrate's determination of probable cause is to be "given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated."

*United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir. 1984) (quoting *United States v. Rambis*, 686 F.2d 620, 622 (7th Cir. 1982)). Even "doubtful cases should be resolved in favor of upholding the warrant." *Rambis*, 686 F.2d at 622.

The Seventh Circuit "has consistently held that, for a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) (quoting *United States v. Anderson*, 450 F.3d 294,

303 (7th Cir. 2006)). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *Zamudio*, 909 F.3d at 175–76 (citing *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "Thus, an affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *Zamudio*, 909 F.3d at 176 (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)). For example, the Seventh Circuit has recognized that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Lamon*, 930 F.2d at 1188 (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)).

Accordingly, the issue here is whether Officer Stachula's affidavits provided sufficient information suggesting a fair probability that evidence of a crime would be found within the three properties. I find that they did.

## A. There was probable cause to believe that evidence of the fraudulent car sale ring would be found at Auto Source (7704 W. Appleton Avenue).

The affidavits established a fair probability that Auto Source was a hub for the fraudulent car sale operation, and as such, there was probable cause to believe that evidence of the operation would be found at Auto Source.

First, the statements from Dorzok (the ex-employee informant) that he assisted in the fraudulent purchase of vehicles at Hayes's direction while working as a mechanic at Auto Source support an inference that criminal activity occurred there. Hayes contends that the affidavit fails to demonstrate that Dorzok is a reliable informant. The Seventh Circuit applies

the *Illinois v. Gates* totality-of-the-circumstances test to warrant affidavits "based on an informant's report." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). "Reliability, veracity, and basis of knowledge are all 'highly relevant,' but the totality-of-the-circumstances approach means 'a deficiency in one may be compensated for . . . by some other indicia of reliability.'" *Glover*, 755 F.3d at 816 (quoting *Gates*, 462 U.S. at 230, 233). Courts weighing the totality of the circumstances in informant cases typically consider five factors: "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Glover*, 755 F.3d at 816 (citing *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011)).

Hayes appears to argue that because Dorzok did not provide detailed information about *Hayes's* involvement in the vehicle fraud operation, his information is not reliable. Even though Hayes is correct that most of Dorzok's information did not directly relate to Hayes, the information as a whole is quite detailed. First, in connection with the vehicle sale fraud, Dorzok was able to describe the vehicles that Youngblood targeted, to name the aliases used by Hayes and Youngblood, and to name the roles of the different parties in the operation. ECF No. 29-1 ¶ 30. Dorzok also provided a credible reason for why he left the operation and no longer had Hayes's contact information—namely, that Dorzok stole a car from Hayes and was promptly beaten by Hayes's associates and ousted from the operation. *Id.* ¶ 33. Additionally, Dorzok provided very detailed information about Coleman, the previous owner of the auto shop, through whom Dorzok met Hayes. *Id.* ¶¶ 33, 34. Dorzok correctly identified Coleman's address, associates, phone number, the name of his girlfriend, and the vehicles he

drove. *Id.*¶¶ 34-40. Information provided by Dorzok led to the apprehension of several suspects in drug trafficking investigations at addresses that Dorzok provided. *Id.* ¶¶ 41-50.

I must look at the validity of an affidavit based on the totality of the circumstances. As a whole, Dorzok's statements were reliable, as they were detailed and were corroborated by the arrests of dealers and evidence found at locations that he named. Even if most of Dorzok's detailed information related to Coleman, it was perfectly reasonable to infer that the information he provided about Hayes, an associate of Coleman, would likewise be reliable.

Furthermore, the affidavit is not solely based on Dorzok's information; law enforcement conducted substantial independent surveillance and gathered plenty of intelligence that supported a reasonable inference that Hayes and Auto Source were involved in criminal activity. Law enforcement had substantial reason to believe that Merrywood was involved in odometer fraud, and that Hayes was a participant. DTO investigators and case agents had proof that several cars sold by Merrywood had a false mileage listed on the odometer. *See id.* ¶¶ 27-28, 88-89. While Hayes may be correct that this alone does not establish that *Auto Source* was part of odometer fraud (since the three cars that the affidavit specifically identified were sold by Merrywood), it comfortably establishes probable cause that Merrywood was involved in odometer fraud. This evidence against Merrywood, combined with the evidence of Hayes and Auto Source's connections with Merrywood, including paper trails through tax forms, Hayes and Woods's personal connections, and Hayes's statement on a recorded phone call that he was picking up car titles for Merrywood suggest that cars changed hands between the two car dealers. *See id.* ¶¶ 21, 23, 19. Because Hayes and Merrywood exchanged cars, and cars sold by Merrywood were eventually sold with doctored odometers, it was reasonable to infer that evidence of odometer fraud would

be found at Auto Source, particularly as the connection to Merrywood's odometer fraud was not Auto Source's only connection to fraud.

In addition to a reasonable probability of finding evidence of odometer fraud at Auto Source, there was also a reasonable probability of finding evidence of check fraud at Auto Source. Between April 2022 and June 2022, at least five vehicles purchased with fraudulent checks were located just outside of Auto Source. Hayes argues that Officer Stachula did not adequately explain how he knew these vehicles were fraudulently purchased, or how they were connected to Hayes. ECF No. 29 at 42. However, Officer Stachula provided more than enough information to suggest that Youngblood was committing check fraud, and Dorzok, in turn, verified Hayes's involvement in this operation *with* Youngblood. The close proximity of the stolen vehicles to Auto Source may not have been enough *on its own* to implicate Hayes, but coupled with Dorzok's statements regarding Hayes's involvement and Hayes's extensive contact with Youngblood—465 phone contacts in the two months law enforcement was closing in around them—Hayes and Auto Source's connection to the criminal operation was highly probable. Furthermore, one of the fraudulently purchased vehicles, a 2010 Hino 338 straight truck, was found parked outside Hayes's house and registered to his address in the name "Hayes Towing & Transport." ECF No. 29-1 ¶¶ 54-55.

**B. There was probable cause to believe that evidence of drug trafficking would be found at Hayes's residence (8018 West Hope Avenue)**

The validity of the search on Hayes's residence heavily relies on whether there was probable cause to believe that Hayes was involved in dealing drugs. Courts will usually find probable cause to search a drug dealer's residence in connection with drug-related crimes.

*Lamon*, 930 F.2d at 1188. I find probable cause to believe that Hayes was involved in dealing drugs, and as such, there was probable cause to search his residence.

There was probable cause to believe that Hayes was involved in dealing drugs. First, there is the word of Dorzok, a coconspirator in the fraudulent car sale ring, that Hayes gave him drugs in exchange for work on multiple occasions. There is also the word of CS-1, a confidential source that named Hayes as the supplier for a lower-level dealer with whom he conducted multiple controlled buys.

Hayes argues that the affidavit fails to demonstrate the reliability of these two informants. However, the reliability of CS-1's statements is not particularly relevant because Officer Stachula does not heavily rely on it to establish probable cause. CS-1's statements helped to initiate the investigation into Hayes, but Officer Stachula does not appear to assert that the statements are an independent basis for finding probable cause to search any property. *See* ECF No. 29-1 ¶ 10 ("Two controlled buys were conducted with CS-1 with associates of Gregory Hayes that provided groundwork to further the investigation into the Gregory Hayes DTO."). CS-1 is not mentioned outside of one single paragraph of the one-hundred and eighteen-paragraph affidavit. This informant's statements played such a miniscule role in the wealth of information supporting the search warrants, so its reliability does not significantly influence the probable cause analysis.

Hayes alleges that Jason Dorzok, whose statements played a much more significant role in the investigation, is not reliable because law enforcement did not corroborate Dorzok's information and because Dorzok's information primarily related to Coleman and not Hayes. As explained in the previous section, Dorzok provided detailed information regarding the operation of the fraudulent car sale organization, as well as reliable information about

Coleman's DTO. Dorzok provided very little information related to Hayes's alleged drug dealing besides noting that Hayes paid him with drugs on several occasions. *Id.* ¶¶ 31, 32. However, because Dorzok's information on the Coleman DTO was detailed and corroborated, it was reasonable to infer that Dorzok's information on Hayes, as Coleman's associate, would be similarly reliable.

The majority of the evidence connecting Hayes to drug dealing came from surveillance by law enforcement officers who observed several confirmed drug dealers coming and going from Hayes's business and behaving suspiciously. First, officers in April 2020 observed a man suspected to be Dionte Paige, a confirmed drug dealer, meeting with Hayes in the Auto Source parking lot to move a large box into Hayes's business. *Id.* ¶ 15. Later, on August 31, 2021, law enforcement found drugs, drug distribution paraphernalia, guns, and a large amount of cash, at the residence of Jermaine Renix, who law enforcement had previously observed stopping at Hayes's business. *Id.* ¶ 22. In January 2022, Henry Bryant, a suspected dealer, was arrested with large amounts of fentanyl and meth, a large amount of cash, and two new license plates registered to Hayes's business in the vehicle. *Id.* ¶ 24. Officers also conducted a controlled buy of fentanyl and heroin with a dealer named James Sims on February 3, 2022, after which Sims went to Hayes's business. *Id.* ¶ 15. Officer Stachula also described a recorded call on which Hayes appeared to speak about a drug exchange when he told someone to get another $1,000 from "Q" after the person gave "Q" heroin. *Id.* ¶ 18.

It's true that if one looks at each of these facts individually, none of them suffices to establish that Hayes is involved in drug trafficking. However, they're parts of a larger mosaic. And when they're added to Dorzok's credible statement that Hayes paid him with drugs on

several occasions, one is hard-pressed to imagine that Hayes was not involved in criminal drug trafficking activity. Accordingly, probable cause supported the search.

### C. There was probable cause to believe that evidence of criminal activity would be found at Nichole Turner's residence (134 East Chateau Place)

Hayes does not specifically discuss the validity of a warrant to search the home of his girlfriend, Nichole Turner. This is probably because the validity of the search is clear. The primary bases for the warrant to search Turner's residence were *not* based on the affidavit described above, but the circumstances surrounding Hayes's arrest at her residence. Recall that after Hayes's arrest, Turner attempted to smuggle a large amount of cash from the house inside a diaper bag. In conducting a protective sweep of the property—the validity of which Hayes has not challenged—officers saw a large bundle of cash and an empty gun case. The cash that Turner attempted to remove from the house, the cash left in the house, and the empty gun case support a finding of probable cause that evidence of a crime would be found upon a full search of the property. Officer Stachula attested that his training and experience indicate that individuals involved in drug trafficking carry large amounts of cash and most other people do not. ECF No. 29-1 ¶ 5(f). Furthermore, Hayes, as a convicted felon, is not permitted to carry a firearm, and the empty gun case suggested that firearms were located on the property and may have been handled or used by Hayes.

Accordingly, I find that a substantial basis existed for concluding that probable cause existed to search all three properties.

## II. Good-faith exception

"A faulty warrant and an illegal search do not necessarily entitle a defendant to suppression of evidence." *United States v. Woolsey*, 535 F.3d 540, 546 (7th Cir. 2008) (citing

*United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005)). "The Supreme Court announced in [*United States v. Leon*, 468 U.S. 897 (1984)], that suppression is inappropriate if the police officers who executed a later-invalidated search warrant did so in good faith." *Woolsey*, 535 F.3d at 546. "An officer's decision to obtain a warrant is prima facie evidence of good faith." *Id.* (citing *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007); *Mykytiuk*, 402 F.3d at 777). A defendant may rebut this presumption by showing (1) "that the judge who issued the warrant abandoned his neutral, detached role and acted as a rubber stamp for the police"; (2) "that the affiant intentionally or recklessly misled the judge"; (3) "that the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreasonable"; or (4) "that the warrant itself is so facially deficient that the executing officers could not reasonably have believed it to be valid." *Woolsey*, 535 F.3d at 546 (citing *Leon*, 468 U.S. at 923; *Otero*, 495 F.3d at 398).

Even if the warrant in this case were invalid, I would still recommend that Hayes's suppression motion be denied because Hayes has failed to rebut the presumption that the executing officers relied on the warrant in good faith. Hayes argues that the warrants in question are invalid because "the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreasonable," and the warrant itself "is so facially deficient that the executing officers could not reasonably have believed it to be valid." *Leon*, 468 U.S. at 923

The crux of Hayes's argument is that "the affidavit does not provide probable cause that Gregory Hayes was involved in any illegal activity whatsoever," because "Hayes is never once independently observed engaging in criminal behavior." ECF No. 29 at 44. However, as I have already explained, there was a more than reasonable probability that evidence of

criminal activity would be found at each of the three properties. Furthermore, law enforcement does not need "direct evidence," and an issuing judge may draw reasonable inferences in granting a warrant application. *Zamudio*, 909 F.3d at 175-176. The analysis in deciding a motion to suppress "center[s] on 'the adequacy of what the affidavit does contain, not on what it lacks, or on what a critic might say should have been added.'" *Marroquin*, 2020 U.S. Dist. LEXIS 203287, at *6–7 (quoting *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009)). Thus, even if the first affidavit could have done more to link Hayes to the two criminal enterprises, the affidavit gave rise to at least some degree of probable cause to search his residence and business. Further, the information in the second affidavit regarding Hayes's arrest at Turner's residence, including the large amount of cash in Turner's possession and the gun case and cash in the home, permitted me to draw the reasonable inference that Tuner's residence would contain additional evidence. The good-faith exception would therefore save the warrant even if I had recommended it be declared invalid.

## CONCLUSION

For all the foregoing reasons, it is **RECOMMENDED** that Gregory Hayes's motion to suppress fruits of invalid search warrant, ECF No. 29, be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2023.

STEPHEN C. DRIES
United States Magistrate Judge